UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 5/9/2022

-------------------------------------------------------------X
JENNIFER HILTON,                                        :
                                                       :
                          Plaintiff,                   :
                                                       :
            - against -                                :
                                                       :
                                                       :
KILOLO KIJAKAZI, Acting Commissioner of                :
Social Security[1]                                     :
                                                       :
                          Defendant.                   :
-------------------------------------------------------------X

20-CV-9318 (RWL)


**DECISION AND ORDER:**
**<u>SOCIAL SECURITY APPEAL</u>**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Jennifer Hilton, represented by counsel, commenced the instant action against Defendant Commissioner (the "Commissioner") of the Social Security Administration (the "Administration"), pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Hilton is not entitled to disability insurance benefits ("DIB"). Hilton moved for summary judgment pursuant to Rule 56(a) of the Federal Rules Of Civil Procedure, asking the Court to vacate the administrative decision and remand the case for further consideration of Hilton's documented impairments. (Dkts. 21, 22.) The Commissioner cross-moved for summary judgment and asks the Court to affirm the Commissioner's decision. (Dkts. 24, 25.) For the reasons explained below, this Court GRANTS Hilton's motion and DENIES the Commissioner's motion.

---

[1] Kilolo Kijakazi became Acting Commissioner of Social Security on July 9, 2021 and was automatically substituted as Defendant in this action. *See* Fed. R. Civ. P. 25 (d).

## PROCEDURAL HISTORY

On April 13, 2018, Hilton filed a Title II application for a period of disability and disability insurance benefits beginning on August 26, 2016.  (R. 10.[2])  Hilton claimed disability due to impairments in her right knee, hip, shoulder, wrist and hand, as well as insomnia.  (R. 61.)

On July 2, 2018, the Administration denied Hilton's claim.  (R. 10.)  Hilton filed a written request for a hearing on July 17, 2018.  (R. 86.)  On May 31, 2019, Hilton, represented by counsel, appeared and testified at an in-person hearing before Administrative Law Judge ("ALJ") Robert Schriver. (R. 37-39.)  A vocational expert ("VE"), Mitchell Schmidt, also appeared and testified.  (R. 37.)  On June 17, 2019, the ALJ issued a decision finding Hilton not disabled and capable of performing work that exists in significant numbers in the national economy.  (R. 18.)  On September 8, 2020, the Appeals Council denied Hilton's request for review of the ALJ's decision, and the ALJ's decision became the final determination of the Commissioner.  (R. 1-6.)

Hilton filed her Complaint in this action on November 6, 2020, seeking district court review pursuant to 42 U.S.C. § 405(g).  (Dkt. 1.)  On January 4, 2021, the parties consented to proceeding before the undersigned.  (Dkt. 12.)

## APPLICABLE LAW

### A.    Standard Of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.  42 U.S.C. § 405(g); *Skrodzki v. Commissioner Of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017)

---

[2] "R." refers to the certified administrative record (Dkt. 20).

(summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue,* 697 F.3d 145, 151 (2d Cir. 2012) (same).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulations)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F.Supp.2d 507, 515, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'"  *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v.*

*Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would ***have to conclude otherwise***."   *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis in original); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."   42 U.S.C. § 423(d)(5)(B).   The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."   42 U.S.C. § 405(b)(1).   While the ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "'reconcile explicitly every conflicting shred of medical testimony,'" *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.   *See Ericksson v. Commissioner Of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01-CV-1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.   *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).   The court must afford the Commissioner's determination considerable

deference and "'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review.'"  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary Of Health And Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984)); *Dunston v. Colvin,* No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (quoting *Jones*, 949 F.2d at 59), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015).  Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  "The Court, however, will not defer to the Commissioner's determination if it is the product of legal error."  *Dunston*, 2015 WL 54169 at *4 (internal quotation marks omitted) (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

## B.   Legal Principles Applicable To Disability Determinations

Under the Act, a person meeting certain requirements and considered to have a disability is entitled to disability benefits.  42 U.S.C. § 423(a)(1).  The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled and therefore entitled to disability benefits, the Commissioner conducts a five-step inquiry.  20 C.F.R. § 404.1520.  First,

the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.  20 C.F.R. § 404.1520(a)(4)(i), (b).  If so, the claimant is not eligible for benefits and the inquiry ceases.

If the claimant is not engaged in any such activity, the Commissioner proceeds to the second step and must determine whether the claimant has a severe impairment, which is an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities.  20 C.F.R. § 404.1520(a)(4)(ii), (c).  If the claimant does not have an impairment or combination of impairments that are severe, the claimant is not entitled to benefits and the inquiry ends.

If the claimant has a severe impairment or combination of impairments, the Commissioner continues to step three and must determine whether the impairment or combinations of impairments is, or medically equals, one of the impairments included in the "Listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the claimant's impairment or impairments meet or medically equal one of those listings, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. § 404.1520(a)(4)(iii), (d).

If the claimant does not meet the criteria for being presumed disabled, the Commissioner continues to step four and must assess the claimant's residual functional capacity ("RFC"), which is the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments.  The Commissioner then determines whether the claimant possesses the RFC to perform the claimant's past work.

20 C.F.R. § 404.1520(a)(4)(iv), (f), (h).  If so, the claimant is not eligible for benefits and the inquiry stops.

If the claimant is not capable of performing prior work, the Commissioner must continue to step five and determine whether the claimant is capable of performing other available work.  20 C.F.R. § 404.1520(a)(4)(v), (g), (h).  If the claimant, as limited by her RFC, can perform other available work, the claimant is not entitled to benefits.  20 C.F.R. § 404.1520(a)(4)(iv), (v).  The claimant bears the burden of proof for the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established that she is unable to perform her past work, however, the Commissioner bears the burden of showing at the fifth step that "there is other gainful work in the national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (internal quotation marks omitted).

## C.   Evaluation Of Medical Opinion Evidence

ALJs must consider medical opinion evidence of record.  *Rodriguez v. Colvin*, No. 12-CV-3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).   Until recently, regulations required application of the so-called "treating physician rule" pursuant to which the opinion of a claimant's treating physician presumptively was entitled to "controlling weight."  20 C.F.R. § 404.1527(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).   For claims filed prior to March 27, 2017, if the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must determine how much weight, if any, to give that opinion.  *Estrella v. Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). In doing so, the ALJ must "explicitly consider" the following, non-exclusive "*Burgess* factors": "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the

remaining medical evidence; and (4) whether the physician is a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess*, 537 F.3d at 129 (citing 20 C.F.R. § 404.1527(c)(2))). While failure to explicitly apply the *Burgess* factors is a procedural error, a reviewing court will not reverse the Commissioner's decision when the Commissioner has given "good reasons" for its weight assignment. *Estrella*, 925 F.3d at 96. With respect to assigning weight to the opinions of non-treating physicians, an ALJ applying the earlier regulations must consider the same factors evaluated when the ALJ does not give controlling weight to a treating physician. 20 C.F.R. § 404.1527(c).

For claims filed on or after March 27, 2017, the new regulations promulgated in 20 C.F.R. § 404.1520c apply. Under the new regulations, a treating doctor's opinion is no longer entitled to a presumption of controlling weight. Instead, all medical opinions are evaluated for their persuasiveness and must be assessed under the same standard of supportability and consistency with no presumption that one opinion carries more weight than another. 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) … including those from your medical sources").

The new regulations give most importance to two of the same factors previously considered to determine whether a treating doctor's opinion should be given controlling weight, i.e., the extent to which a treating physician's opinion is supported by well-accepted medical evidence and not inconsistent with the rest of the record. 20 C.F.R. § 404.1520c(a) ("The most important factors we consider when we evaluate the persuasiveness of medical opinions … are supportability … and consistency"). In most instances, the ALJ may, but is not required to, discuss the other factors previously

required to assess medical opinion evidence (i.e., relationship with the claimant, specialization, and other relevant factors).  20 C.F.R. § 404.1520(b)(2).  The ALJ must consider those additional factors, however, if there are "two or more medical opinions or prior administrative medical findings about the same issue [that] are both equally well-supported …and consistent with the record … but are not exactly the same, we will articulate how we considered the other most persuasive factors . . . ."[3]  20 C.F.R. § 404.1520c(b)(3).

An ALJ must not only consider supportability and consistency in evaluating medical source opinions but also must explain the analysis of those factors in the decision.  20 C.F.R. § 404c(b)(2); *Vellone v. Saul*, No. 20-CV-261, 2021 WL 319354, at *6 (S.D.N.Y. Jan. 29, 2021), *R. & R. adopted*, 2021 WL 2801138 (S.D.N.Y. July 6, 2021) ("in cases where the new regulations apply, an ALJ ***must*** explain his/her approach with respect to the first two factors when considering a medical opinion") (emphasis in original).  As noted in the Administration's revisions to the regulations, "the articulation requirements in [the] final rules" are intended to "allow a … reviewing court to trace the path of an adjudicator's

---

[3] More specifically, if medical opinions on the same issue are equally well-supported and consistent with the record but are not identical, the ALJ must "articulate how [he] considered the other most persuasive factors."  20 C.F.R. § 404.1520c(b)(3).  Of the remaining factors, the third is the relationship with the claimant, for which the ALJ must consider the (1) length of the treatment relationship, (2) frequency of examinations, (3) purpose of the treatment relationship, (4) extent of the treatment relationship, and (5) examining relationship.  20 C.F.R. § 404.1520c(c)(3).  The fourth factor – specialization – requires the ALJ to account for whether the medical opinion is provided by a specialist that has expertise in the area related to the medical issue.  20 C.F.R. § 404.1520c(c)(4).  Lastly, the fifth factor is a catchall, which accounts for "other factors that tend to support or contradict a medical opinion or prior administrative medical finding."  20 C.F.R. § 404.1520c(c)(5).  That includes, but is not limited to, evidence showing a medical source has familiarity with other evidence in the claim or an understanding of [the SSA's] disability program's policies and evidentiary requirements."  *Id.*

reasoning …." Revisions To Rules Regarding The Evaluation Of Medical Evidence, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017); *see also Amber H. v. Saul*, No. 20-CV-490, 2021 WL 2076219, at *4 (N.D.N.Y. May 24, 2021) ("Although the new regulations eliminate the perceived hierarchy of medical sources … the ALJ must still 'articulate how [he or she] considered the medical opinions' and 'how persuasive [he or she] find[s] all of the medical opinions") (alterations in original) (quoting 20 C.F.R. § 416.920c(a), (b)).

Under the previous regulations, an ALJ's failure to consider the factors prescribed by the treating physician rule was grounds for remand. Similarly, under the current regulations, an ALJ's failure to properly consider and apply the requisite factors is grounds for remand. *See, e.g.*, *Rivera v. Commissioner Of The Social Security Administration*, No. 19-CV-4630, 2020 WL 8167136, at *22 (S.D.N.Y. Dec. 30, 2020), *R. & R. adopted*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021) (remanding so that ALJ may "reevaluate the persuasiveness assigned to the opinion evidence of record and explicitly discuss both the supportability and the consistency of the consulting examiner's opinions"); *Andrew G. v. Commissioner Of Social Security*, No. 19-CV-942, 2020 WL 5848776, at *6-9 (N.D.N.Y. Oct. 1, 2020) (remanding due to ALJ's failure to adequately explain the supportability or consistency factors that led her to her decision). As Ms. Hilton's application post-dates March 27, 2017, the Court applies the revised regulations applicable to evaluation of medical opinions.

**THE FACTUAL AND MEDICAL RECORD**

**A.     Personal Background**

Hilton was born on September 1, 1971 and has a twelfth-grade education. (R. 41.) She lives alone in an apartment, and she is single with no children. (R. 43, 263.)

Hilton worked as an inventory analyst from August 1998 to September 2008.  (R. 42-43, 53, 252.)  More specifically, she counted drugs in a warehouse to be distributed to hospitals and doctors and entered corresponding data into a spreadsheet.  (R. 43.) Following the inventory analysist job, Hilton served as a corrections officer, ultimately becoming Captain, at Rikers Island Jail Facility from November 2008 to August 2016.  (R. 43, 252, 264, 436.)

While serving as a corrections officer, Hilton was injured on multiple occasions leading her to stop working and file for disability benefits.  (R. 45.)  As described in more detail below, Hilton injured her left shoulder, elbow, and wrist in physical altercation with one prisoner, and her right knee in an altercation with another prisoner.  (R. 45, 261, 264.) Hilton received medical monitoring at her job in mid-2016 and was placed on "desk duty."[4] (R. 41-42.)  Due to the vacation days Hilton had acquired over her years of service, she continued to earn past medical leave until November 2017 when she stopped receiving payroll.  (R. 42.)

Hilton testified that her injuries and chronic pain largely restrict her to her apartment and prevent her from doing any activities besides watching television.  (R. 44, 47.)  She is unable to cook or clean but has a friend who comes over to perform such tasks for her. (R. 43-44.)  When she needs to go to a doctor's appointment, she receives a ride and typically orders all necessities on amazon.com because it delivers to her house.  *Id.*

Hilton has been prescribed and takes Vicodin for pain since at least April 2016. (R. 259, 314, 402.)  She has also been prescribed Percocet for pain and Valium for

---

[4] The Record is somewhat unclear whether Hilton stopped going to work all together in August 2016 or showed up beyond that date but was on 'desk duty.'  (R. 42.)

insomnia.  (R. 46, 198, 224, 254.)  Hilton testified that she experiences nausea, difficulty concentrating, and tiredness from taking the Vicodin.  (R. 46.)

## B.    Medical History

On April 10, 2016, while on duty as Captain at Rikers Island, Hilton had a confrontation with an inmate.  (R. 261.)  The next day, she sought medical treatment at Rehabilitation Medicine Center of New York and was seen by Dr. Michael K. Seidenstein, an orthopedic surgeon.  Hilton reported pain in her left shoulder and arm and stated that she had difficulty raising it.  Dr. Seidenstein noted marked tenderness and restriction of motion and referred her for an MRI.  (R. 261.)

On April 20, 2016, Hilton went to the Rehabilitation Medicine Center of New Jersey, P.A. for initial evaluation and was seen by Dr. Robert D. Kramberg.  (R. 313.)  She complained of left shoulder, elbow, forearm, wrist, and hand pain which she had been suffering from since the incident at work on April 10, 2016.  (R. 313.)  Dr. Kramberg noted limited range of motion in Hilton's left shoulder with a click and pain; tenderness but full extension in her left elbow; and limited range of motion in her left wrist.  (R. 313.)  Hilton was assessed to have "(1) Left sided rotator cuff syndrome (2) Left sided lateral epicondylitis (3) s/p sprain and strain of left forearm (4) s/p sprain and strain of left wrist and hand."  (R. 314.)  Dr. Kramberg prescribed physical therapy three times a week for four weeks, Vicodin every four to six hours, and Valium.  (R. 314.)  Dr. Kramberg remained Hilton's doctor from 2016 through 2018.  (*See* R. 345, 351, 355, 358-60, 406-12.)

On June 1, 2016, Hilton was examined by Dr. Kramberg again and reported persistent pain in her left shoulder, wrist, and hand.  (R. 315.)  Dr. Kramberg noted limited range of motion, persistent tenderness, and positive impingement.  Hilton was referred

for an MRI scan of her left side and instructed to continue her present course of physical therapy.  (R. 315.)

On June 22, 2016, Hilton presented herself for an initial evaluation due to a second work injury resulting from a confrontation with an inmate that occurred on May 28, 2016. (R. 263.)  Hilton reported suffering from right knee pain since the date of the incident.  Her knee pain was "constant, sharp in quality" and she had experienced "two episodes of knee buckling and difficulty walking up and down stairs."  Dr. Kramberg referred Hilton for an MRI scan of her right knee and another physical therapy program directed at her right knee.  (R. 263.)

Hilton was examined by Dr. Kramberg again on June 29, 2016, and maintained that she had persistent left shoulder, wrist, and hand pain.  (R. 320.)  The MRI Hilton underwent on June 14, 2016, revealed a partial tear of the supraspinatus tendon and joint changes consistent with impingement syndrome.  (R. 320.)  Hilton was administered an injection of Depomedrol and told to continue physical therapy two times a week for another four weeks.  (R. 320.)

Hilton had a follow up appointment with Dr. Kramberg on July 13, 2016, at which she complained of persistent pain and swelling in her right knee.  (R. 271.)  The MRI of her right knee revealed a tear of the posterior horn of the medial meniscus, mucoid degeneration of the later meniscus, and joint effusion.  Dr. Kramberg referred Hilton to Dr. Seidenstein for an orthopedic consultation.  (R. 271.)  On July 20, 2016, Hilton saw Dr. Seidenstein and reported right knee pain, discomfort, and that "the more she walks the more it gives way."  (R. 264.)  Dr. Seidenstein requested precertification for an

operative arthroscopy due to possible meniscal repair and lateral release and continued to prescribe physical therapy.  (R. 264.)

Hilton had surgery on her right knee on September 1, 2016, and, two weeks later she saw Dr. Kramberg for a follow up visit.  (R. 273, 283.)  Dr. Kramberg noted that there were no post-operative complications and that Hilton had full extension in her knee and was wearing a knee brace.  (R. 273.)  On the same day, a physical therapy progress report for her left shoulder noted that Hilton had aching pain, difficulty with dressing, reaching shelves and lifting objects over 7-8 pounds.  She was also using her crutches. (R. 333.)

Through the end of 2016, Hilton attended physical therapy and follow-up visits with Dr. Kramberg.  Hilton consistently complained of pain and weakness in her right leg and knee and at times had an antalgic gait.  (R.  274, 297, 368.)  On November 16, 2016, Dr. Seidenstein noted that Hilton was "not fit to return to work at this time."  (R.444.)

Throughout 2017 there is an extensive record of Hilton's doctors' visits as she continued physical therapy and was frequently re-evaluated for pain in her left shoulder and right knee.   She consistently complained to Dr. Kramberg and Dr. Seidenstein of persistent weakness and pain in her body, swelling, antalgic gait, and she had limited ranges of motion.  (R. 275, 303, 326, 327, 356, 357, 358.)  Several weeks later on January 25, 2017, Hilton reported to Dr. Seidenstein that she "is doing well regarding her knee" (R. 266).  However, during evaluations of her right knee in May, June and August of 2017, Hilton reported that she had consistent pain, weakness, and at times swelling in her knee. (R. 305-08.)  On July 12, 2017, Dr. Kramberg referred Hilton to Dr. Seidenstein to discuss surgical intervention for her left shoulder.  (R. 327.)  Based on the absence of records, it

does not appear that Hilton pursued the left shoulder surgery.  In August 2017, Dr. Kramberg stated that Hilton had a "40% schedule loss of use of the right leg."  (R. 276.)

The same types of visits and complaints of pain and swelling continued throughout 2018.  (R. 309-10, 402, 406, 407.)  On January 10, 2018, Dr. Kramberg wrote a letter for purposes of Worker's Compensation summarizing Hilton's injuries and explaining that her treatment at the time included extensive physical therapy, anti-inflammatory medications, and pain medications.  (R. 328.)  Dr. Kramberg stated that Hilton had 30% schedule of loss of use of the left shoulder, 7% scheduled loss of use of her left elbow, as well as 20% schedule of loss of use of her left hand.  (R. 329-30.)  In May 2018, Hilton still had limited range of motion in her knee and tested positive on a McMurray test and a patellar compression test.[5]  (R. 406.)  Hilton underwent another MRI of her right knee on November 19, 2018.  (R. 430.)  It revealed postoperative changes and a grade 1 sprain of both the anterior and medial cruciate ligaments, but no tear of the medial meniscus; the posterior cruciate ligament and lateral meniscus were intact.  (R. 430.)

**C.      Opinion Evidence**

There are four relevant sources of medical opinions regarding Hilton's physical abilities.  The opinions come from two examining consultative doctors, one non-examining consultative doctor, and Hilton's treating physiatrist.

**1.      Dr. J. Serge Parisien – Examining Orthopedic Surgeon For Worker's Compensation**

On October 9, 2017,  Hilton attended an independent orthopedic evaluation by Dr. Parisien.  (R. 399-404.)  Dr. Parisien examined Hilton's left wrist and left hand and noted

---

[5] A McMurray test is used to evaluate whether an individual has tears in the meniscus of the knee.

no "obvious deformities;" "gross swelling or effusion;" or "gross infection."  (R. 400-01.) Range of dorsiflexion, palmar flexion, radial deviation and ulnar deviation were all "normal."  (R. 400.)  Hilton did not have carpal tunnel or atrophy of intrinsic musculature of the hand and grip strength was normal.  (R.  400.)

Dr. Parisien examined Hilton's right knee and noted that it had full extension and flexion to approximately 0-115 degrees, which is within normal range.  (R. 400.)  There was no joint line tenderness to palpation, no instability to varus or valgus stress, no swelling, and no obvious atrophy.  (R. 400-01.)  Dr. Parisien stated that Hilton had a 0% "scheduled" loss of use of the left hand and a 20% scheduled loss of use of the right leg. (R. 401.)  The determination of Hilton's loss of use was based on the New York Worker's Compensation Board Guidelines.  (R. 401.)

### 2.    Dr. Olga Yevsikova – Agency Consultative Examiner

As part of the Administration's review of Hilton's claims, Dr. Olga Yevsikova conducted an internal medicine examination of Hilton on June 13, 2018.  (R. 373-75). Dr. Yevsikova concluded that Hilton appeared to be in no acute distress as she walked slowly on exam and walked normally without any limping following the exam.  (R. 373.)  Hilton was able to stand on her toes with support and was able to do a few steps on her heels with support but with some difficulty.  (R. 373.)  Dr. Yevsikova reported that Hilton had full range of motion in her elbows, forearms and wrists bilaterally, left shoulder, and cervical spine; decreased range of motion in her right shoulder, lumbar spine, and hips and knees; and her hand and finger dexterity was intact.  (R. 374.)

Dr. Yevsikova found that Hilton had moderate limitation squatting and kneeling; mild to moderate limitation walking or standing for a prolonged time, climbing stairs, heavy lifting and carrying; mild limitation performing overhead activity with her right arm and that

she should avoid unprotected heights or any activity that puts her at risk of falling.  (R. 375.)

### 3.    Dr. A. Lee – Agency Medical Record-Review Consultant

On June 28, 2018, Dr. Lee, a non-examining medical consultant, reviewed Hilton's medical record and opined that Hilton's symptoms were expected to be caused by her impairments but not to the extent alleged.  (R. 64.)  Dr. Lee noted that her residual functional capacity included the following: she had exertional limits; she could occasionally lift and/or carry twenty pounds; she could frequently carry ten pounds; she can stand, walk or sit six hours in an 8-hour workday; she can occasionally climb ramps or stairs, ladders or ropes, stoop, kneel, crouch, or crawl.  (R. 65-66.)  Dr. Lee concluded that Hilton was not disabled.  (R. 67.)

### 4.    Dr. Robert Kramberg – Treating Physiatrist

Following years of treating Hilton, Dr. Kramberg provided a medical source statement on April 29, 2019.  (R. 483-89.)  Dr. Kramberg opined that Hilton could occasionally lift or carry up to ten pounds but could never lift or carry more than twenty pounds.  (R. 484.)  Dr. Kramberg stated Hilton could sit or walk for twenty minutes and could stand for thirty minutes; that Hilton uses a cane to ambulate and can only walk 50 feet without a cane; she can occasionally reach, handle, finger, push/pull with each hand; she can never stoop, kneel, crouch, climb ladders, or crawl; she can occasionally climb stairs and can frequently balance; she can perform tasks such as shopping, prepare a simple meal, and take care of her personal hygiene.  (R. 285-89.)

## D.    Vocational Expert Testimony

At the hearing, the ALJ asked the VE to consider whether there were any jobs in the national economy that an individual of Hilton's age, educational level, prior work

history, and RFC could perform.  (R. 54-55.)  The VE testified that such an individual could perform the jobs of addresser, nut sorter, and cuff folder.  (R. 55.)  Hilton's attorney then asked the VE whether Hilton could perform those jobs if, as her treating physician opined, she is limited to occasional reaching, handling, fingering, feeling, pushing, and pulling with both the right and left hands.  The VE answered that she would not be able to perform the jobs.  (R. 56.)  The VE also stated that Hilton would not be able to perform the jobs if she were to be absent in excess of one day a month.  (R. 56.)

### E.    The ALJ's Decision

ALJ Schriver issued his decision on June 17, 2019, employing the requisite five-step analysis.  (R. 10-18.)  He found that Hilton meets the insured status requirements of the Social Security Act through December 31, 2022 and that she had not been engaged in substantial gainful activity since the alleged onset date of August 26, 2016.  (R. 12.)  He found that Hilton had four severe impairments – internal derangement of her right knee (status post-arthroscopic repair), internal derangement of her left shoulder, and a strain/sprain of the left wrist.  (R. 13.)   At the same time, he found that none of those impairments, alone or in combination, met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 13.)  The ALJ concluded that the medical evidence of record did not document any signs, symptoms, and/or laboratory findings indicating any impairment severe enough to meet the criteria of any listed impairment.

Based on the entirety of the record, the ALJ determined Hilton had the RFC to perform sedentary work except that she can frequently reach overhead with her right arm, can occasionally crouch, kneel, crawl, climb or stoop and can have no exposure to unprotected heights and requires the use of a cane to ambulate.  (R. 13.)  The ALJ first

determined that Hilton's medically determinable impairments could reasonably be expected to cause symptoms; however, Hilton's statements concerning the intensity, persistence and limiting effects of those symptoms were "not entirely consistent" with the evidence in the record.  (R. 13.)  The ALJ did not comment on Hilton's medications or any side effects arising from them.

In reaching his decision, ALJ Schriver assessed each of the medical opinions.  He found Dr. Yevsikova's opinion persuasive because her opinions were supported by a detailed report containing her clinical findings on Hilton's physical examination and is consistent with the record as a whole.  (R. 16.)  Conversely, the ALJ found Dr. Lee's opinion not persuasive because it was not supported by a detailed rationale and was not entirely consistent with the record as a whole, including Dr. Yevsikova's opinion.  (R. 16.)

As for Dr. Parisien's opinions, the ALJ did not find the particular percentages of disability assigned to Hilton to be persuasive or applicable in the Social Security disability context.  (R. 16.)  Dr. Parisien evaluated Hilton's disability based on the New York Worker's Compensation Board Guidelines, and ALJ Schriver explained that "whether or not a claimant is able to work or has a 'disability' is a decision reserved exclusively to the Commissioner to decide."[6]  (R. 16.)

The ALJ found Dr. Kramberg's opinion that Hilton would be unable to perform even sedentary work with limitations as to sitting, standing, and walking unpersuasive because

---

[6] *See Ackley v. Colvin*, No. 13-CV-6656T, 2015 WL 1915133, at *5 (W.D.N.Y. April 27, 2015) ("the ALJ correctly noted that the determination of disability in the context of a workers' compensation claim uses a different standard than the Social Security Act"); *Rosado v. Shalala*, 868 F.Supp. 471, 473 (E.D.N.Y. 1994) ("an opinion rendered for purposes of workers' compensation is not binding on the Secretary").

the treatment records do not support such extreme limitations nor are they consistent with the record as a whole.  (R. 16.)

Finally, the ALJ determined that Hilton was unable to perform any past relevant work but, considering her RFC, she could perform the jobs addresser, nut sorter, and cuff folder.  (R. 17-18.)

## DISCUSSION

Hilton contends that the ALJ's decision should be remanded because his RFC determination was not supported by substantial evidence.  (Pl. Mem. at 15, 17.[7])  Hilton advances two arguments: first, the ALJ's finding that Hilton can perform the sitting and reaching required for sedentary work is not supported by substantial evidence; second, the ALJ's finding that Hilton did not allege any side effects from her medication also is not supported by substantial evidence.  (Pl. Mem. at 14-17.)  In response, the Commissioner argues that substantial evidence corroborates the ALJ's finding that Hilton is able to perform sedentary work and that there is no evidence in the record, other than Hilton's testimony, that supports the notion that her side effects resulted in any significant functional restrictions.  (Def. Mem. at 20-25.[8])  The Court agrees with Hilton as to the first issue, and the Commissioner as to the second.

---

[7] "Pl. Mem." refers to Hilton's "Memorandum Of Law In Support Of Plaintiff's Motion For Summary Judgement On The Pleadings" (Dkt. 22).

[8] "Def. Mem." refers to Defendant's "Memorandum Of Law In Support Of The Commissioner's Cross-Motion For Judgment On The Pleadings And In Opposition To Plaintiff's Motion For Judgment On The Pleadings" (Dkt. 25.)

**A.     The ALJ's Decision That Hilton Can Perform Sedentary Work Is Not Supported By Substantial Evidence**

Hilton argues that the ALJ's determination that Hilton can perform the sitting and reaching aspects of sedentary work is not supported by substantial evidence.  (Pl. Mem. at 14.)  Hilton does not present any substantive arguments to support this proposition. Instead, her moving brief merely quotes the definition of 'sedentary work' as set forth in Social Security Ruling 96-9p and restates Dr. Kramberg's opinion with no analysis.  (Pl. Mem. at 14-15.)  As Hilton failed to develop her argument, it could be rejected for that reason alone.  *Casciani v. Nesbitt*, 392 F. App'x 887, 889 (2d Cir. 2010) ("[M]erely … asserting an issue without advancing an argument does not suffice to adequately raise an issue for appellate review"); *Pezza v. Commissioner Of Social Security*, No. 19-CV-3254, 2020 WL 3503170, at *4 (E.D.N.Y. June 29, 2020) ("It is well-settled that 'issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived'") (quoting *Tolbert v. Queens College*, 242 F. 3d 58, 76 (2d Cir. 2001)).  Nonetheless, the Court has reviewed the record and finds it in the interest of justice to address Hilton's contention.

**1.     Sitting**

With respect to sitting, the ALJ does not reference or comment on Hilton's sitting abilities in his decision.  Yet sitting for lengthy periods and for much of the workday is critical to sedentary work.

Pursuant to regulation, sedentary work requires that a person sit for most of an eight-hour workday.  20 C.F.R. § 404.1567(a); *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) (observing that "the concept of sedentary work contemplates substantial sitting"). A sedentary worker thus needs to be able to sit for up to a total of six hours in an

eight-hour workday.  Social Security Ruling ("SSR") 83-10 ("periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday").  And, as a result, a claimant must be able to "remain seated for extended periods of time."  *Vellone On Behalf Of Vellone v. Saul*, No. 20-CV-261, 2021 WL 2801138, at \*1 (S.D.N.Y. July 6, 2021); *see also Ferraris*, 728 F.2d at 587 ("alternating between sitting and standing may not be within the concept of sedentary work").

The Court finds that the ALJ's implicit conclusion that Hilton can perform the sitting requirement of sedentary work is not supported by substantial or affirmative evidence. *See Rosa v. Callahan*, 168 F.3d 72, 80-81 (2d Cir. 1999) ("ALJ mistakenly permitted the Commissioner to satisfy its burden of proof without requiring affirmative evidence demonstrating Rosa's residual functional capacity to meet the demands of sedentary work"); *Jackson v. Kijakazi*, No. 20-CV-7476, 2022 WL 620046, at \*20 (S.D.N.Y. Mar. 3, 2022) ("The existence of substantial evidence to support an RFC determination cannot be proven by an absence of limitations, but rather must be shown through evidence of what the claimant **can** do that meets the RFC asserted") (emphasis in original).

The only opinion that the ALJ found persuasive, Dr. Yevsikova's, does not address Hilton's sitting abilities or limitations.[9]  Based on her exam of Hilton, Dr. Yevsikova stated that Hilton had moderate limitation to squatting and kneeling, mild to moderate limitation to walking for a prolonged time, climbing stairs, and standing for a prolonged time, mild to moderate limitation to heavy lifting and heavy carrying, and a mild limitation for

---

[9] Dr. Kramberg opined that Hilton could sit no more than a total of one hour in a workday. (R. 485.)  Dr. Lee opined that Hilton could sit six hours in a workday. (R. 65.)  The ALJ, however, rejected both opinions as unpersuasive.  (R. 16).

performing overhead activity with her right arm.  (R. 375.)  The 'musculoskeletal' portion of Dr. Yevsikova's examination of Hilton states "[straight leg raise] supine and sitting position bilaterally" (R. 374), but her opinion offers no assessment of the length of time Hilton may be able to sit either at one time or in total during an eight-hour workday.  (R. 374.)  While one could infer that Hilton does not have a limitation in sitting from the fact that Dr. Yevsikova makes no mention of Hilton's sitting abilities, such an inference is counter to the other evidence in the record.

At the hearing, Hilton testified that she has "a lot" of problems with sitting and that she could sit for a "maximum of 30 minutes."  (R. 47-48.)  She also testified that the pain from sitting for more than thirty minutes "starts in the pelvic region … and then it'll eventually escalate around the back portions of [her] hips."  (R. 48.)  Additionally, Hilton testified that "standing is not as bad as … sitting" (R. 48) and that sitting for periods of time "hurts too much."  (R. 51.)  When asked in her function report to explain "how [her] illnesses, injuries, or conditions affect any of the following" Hilton wrote "knee pain" next to "sitting."  (R. 206.)  That is fully consistent with Hilton's medical history demonstrating that Hilton injured her right knee, required surgery, continued to experience unceasing knee pain, and has been prescribed intense pain medication since mid-2016.  (*See e.g.* R. 263, 265, 267, 268, 269, 270, 271, 272, 273, 274.)  As indicated by Dr. Kramberg, severe impairments to one's knee would undoubtedly impact one's ability to sit.  (R. 485.).  Yet, the ALJ does not discuss Hilton's ability to sit in his decision.

In *Vellone*, the Court held that the ALJ erred in finding that the Plaintiff could perform sedentary work because the determination was not supported by substantial evidence.  2021 WL 2801138 at *1.  The Court stated that the "only evidence in the record

that directly addresses Plaintiff's ability to remain seated comes from … Plaintiff's long-time treating physician, [who] opined that Plaintiff would be limited to three hours of sitting per day." *Id.* at *2.  The ALJ, however, relied on two doctor's treatment notes that were "nearly devoid of reference to Plaintiff's ability to sit." *Id.*  Thus, by "discounting the [long-term treating physician's] consultative examination report and Plaintiff's subjective complaints, ALJ Carlton was left with a record nearly devoid of evidence pertaining to Plaintiff's ability to remain seated for extended periods of time." *Id.* at *3.  The Court found that by concluding that the Plaintiff could remain seated, the ALJ "improperly substitute[d] his own judgment for competent medical opinion." *Id.*; *see also Riccobono v. Saul*, 796 F. App'x 49, 50 (2d Cir. 2020) ("The ALJ cannot arbitrarily substitute her own judgment for competent medical opinion") (alterations and citation omitted)); *Balsamo v. Chater*,142 F.3d 75, 81 (2d Cir. 1998) (same); *Hilsdorf v. Commissioner Of Social Security*, 724 F.Supp.2d 330, 347 (E.D.N.Y. 2010) ("an ALJ who makes an RFC determination in the absence of supporting expert medical opinion has improperly substituted his own opinion for that of a physician, and has committed legal error").  ALJ Schriver committed the same error in the instant case.  By relying on a medical opinion that did not even reference Hilton's sitting abilities and discounting both Dr. Kramberg's opinions and Hilton's subjective complaints, the ALJ improperly substituted his own judgment for competent medical opinion, and "mistakenly permitted the Commissioner to satisfy its burden of proof without requiring affirmative evidence demonstrating [Hilton]'s residual functional capacity to meet the demands of sedentary work." *Rosa*, 168 F.3d at 80-81.

### 2.    Reaching

The ALJ found that Hilton was limited to "frequently" reaching overhead with her right arm.  (R. 13.)  He implicitly found no limitation with respect to Hilton's ability to reach

24

with her left arm.  The ALJ's findings and reasoning in that regard are inconsistent and require remand for further consideration and clarification.

The medical record contains a good deal of information about Hilton's left arm and shoulder pain arising from her April 2016 work injury.  (*See*, *e.g.*, R. 313, 314, 315, 320, 323, 324, 325, 326, 402.)  Hilton had an MRI of her left shoulder in April 2016 which revealed a "partial tear rotator cuff undersurface proximal supraspinatus tendon, distal supraspinatus tendinopathy and acromioclavicular hypertrophic changes associated with impingement syndrome." (456-57.)  Hilton's left rotator cuff was "aggravated by physical activity" (R. 331), and she had "difficulty" with "overhead activities." (R. 332.)  In response to whether she has "any problems with reaching," Hilton testified that "[o]nce my arms go about to my eye level, that's when I start getting the pains in the backs – like in my shoulders." (R. 50.)  In reviewing 2016 medical records, the ALJ acknowledged that physical exams "revealed left shoulder decreased range of motion with clicking and pain." (R. 14.)  Similarly, the ALJ recited exam records from almost two years later (March 2018) showing "decreased range motion of the left shoulder." (R. 15.)

In contrast, the sole opinion that the ALJ found persuasive – Dr. Yevsikova's – found that Hilton had full range of motion in her left shoulder and did not mention any limitation with respect to Hilton's left shoulder.[10]  (R. 374.)  Instead, Dr. Yevsikova found decreased range of motion in Hilton's right shoulder and a mild limitation on overhead

---

[10] Dr. Kramberg, which the ALJ found unpersuasive, opined that Hilton could only "occasionally" reach overhead with both hands.  The medical source statement filled out by Dr. Kramberg includes the following levels of activity for use of hands and reaching: "Never"; "Occasionally," meaning "very little to one-third of the time"; "Frequently," meaning "one-third to two-thirds of the time,"; and "Continuously," meaning "more than two-thirds of the time." (R. 486.)

reaching with her right arm, even though the only medical record evidence regarding the right arm pertains to surgery on Hilton's right shoulder from 2011 and an X-ray that revealed no abnormalities in June 2018.  (R. 375.)

Just after reciting the medical history of limited range of motion in Hilton's left shoulder, and Dr. Yevsikova's contrasting finding full range of motion in Hilton's left shoulder, the ALJ justified his RFC determination "overall" on, among other things, "the positive clinical findings" of "decreased range of motion of the right knee, left shoulder and left wrist."  (R. 15.)  He makes no mention of any such clinical findings as to Hilton's right shoulder.  The clinical findings the ALJ recites and on which he relied thus are inconsistent with the one medical opinion he found persuasive, which found limitations to the right shoulder but not the left.  By the same token, the ALJ's ultimate RFC determination that Hilton is limited to "frequently" reaching overhead with her right arm without mention of any limitation in Hilton's left arm, is aligned with Dr. Yevsikova's findings but likewise inconsistent with the record.

In the end, the ALJ's decision with respect to reaching does not reconcile inconsistent evidence and itself is internally inconsistent.  It may be that Hilton has function-limiting range of motion in her right arm and not her left arm.  It may also be that Hilton has function-limiting range of motion in her left arm and not her right arm. If that is the case, then the ALJ's problematic analysis may be harmless.  But that would depend on the extent of the limitation in the left arm.  It may also be that Hilton has limited range of motion in both her arms.  If so, the Court has no basis to assess whether that would alter the RFC determination.

To determine whether an ALJ's determination is supported by substantial evidence "[t]he [ALJ] must … explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Winters v. Commissioner Of Social Security*, No. 18-CV-4070, 2019 WL 4743822, at *11 (S.D.N.Y. Sept. 16, 2019); *see also Decker v. Astrue*, No. 11-CV-5593, 2013 WL 4804197, at *5 (S.D.N.Y. Sept. 9, 2013) (the regulations provide that the ALJ "will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence") (alteration in original).  The ALJ failed to do so here.

The ALJ compounded that error in his consideration of Hilton's daily activities. Specifically, the ALJ determined that Hilton's activities are "inconsistent with additional restrictions" beyond what the ALJ determined to be Hilton's RFC.  (R. 16.)  The activities the ALJ referenced were that Hilton could "travel independently via driving a car and/or using public transportation … shop[ ] by mail, pay[ ] bills, count[ ] change, handl[e] a savings account, talk[ ] on the phone … watch[ ] TV, listen[ ] to the radio and read."  (R. 15-16.).

An ALJ is entitled, indeed obligated, to consider the claimant's activities when determining the claimant's RFC.  *See* 20 C.F.R. § 404.1529(c)(3)(i); SSR 96-8p ("The RFC assessment must be based on all of the relevant evidence in the case record, such as: … reports of daily activities").  At the same time, without additional adequate evidence supporting an ALJ's conclusion, a claimant's daily activities "do not by themselves contradict allegations of a disability."  *Woodford v. Apfel*, 93 F. Supp.2d 521, 529 (S.D.N.Y. 2000); *see also Arch v. Commissioner Of Social Security*, No. 20-CV-2842,

2021 WL 4200719, at *12 (S.D.N.Y. Aug. 3, 2021), *R. & R. adopted*, 2021 WL 4710448 (S.D.N.Y. Oct. 6, 2021) ("a claimant's ability to engage in self-care and other domestic activities does not by itself establish that the claimant is not disabled") (quoting *Woodford*, 93 F. Supp.2d at 529); *Stellmaszyk v. Berryhill*, No. 16-CV-9609, 2018 WL 4997515, at *25 (S.D.N.Y. Sept. 28, 2018) ("courts have recognized that a claimant's ability to engage in certain life activities … does not necessarily mean that the claimant is capable of meeting the full requirements of sedentary work").

The ALJ erred in his consideration of Hilton's daily activities. First, the mere fact that Hilton could drive may indicate that she can reach forward, but indicates nothing about the extent to which she can reach overhead (or the length of time she can remain sitting for that matter). And, at the hearing one year later, Hilton testified that she now uses Uber instead of driving herself. (R. 43.). Second, shopping by mail, paying bills, counting change, and handling a savings account go to Hilton's mental faculties and fingering/handling abilities – which are not at issue – rather than her ability to reach overhead. Similarly, talking on the phone, watching television, listening to the radio, and reading speak more to mental abilities such as concentrating and comprehension, than they do to ability to sit and reach overhead. The ALJ thus erred to the extent he considered any of those activities as inconsistent with physical restrictions beyond those he found.

In sum, the ALJ erred in his analysis of Hilton's RFC with respect to both sitting and reaching. That is not to say the ALJ necessarily should reach a different outcome on remand. But based on the current record and reasoning, the decision cannot stand.

**B.    The ALJ Did Not Err With Respect To Medication Side Effects**

Hilton's second argument that the ALJ erred, as set forth in the relevant point heading, is that the ALJ found "That The Plaintiff Did Not Allege Any Side Effects From Her Medications."  (Pl. Mem. at 16.)  To support that assertion, Hilton does no more than cite three regulatory rulings confirming that side effects of medication are relevant to determining RFC (which no party disputes),[11] recites that Dr. Kramberg saw Hilton for pain and prescribed her Vicodin and Valium, and references Hilton's testimony that the medicines make her nauseated, sleepy, and less able to concentrate and "find her words." (Pl. Mem. at 16-17.). The ALJ's decision does not include any mention of Hilton's medications or side effects.

To the extent Hilton's argument is aimed at proving she actually alleged side effects from her medication, then her recitation qualifies as a developed argument.  But the ALJ's decision does not make any comment on whether Hilton alleged side effects from medication.  The premise to the argument thus is faulty.  The argument thus has no merit.

Hilton's argument has a bit more traction, however, to the extent it is directed at whether the ALJ even considered side effects.  The ALJ's decision does not expressly address the issue.  Nonetheless, the ALJ expressly discounted Hilton's testimony of her symptoms as "somewhat exaggerated" given its not being entirely consistent with the record.  (R. 13, 14.)  Indeed, the record amply supports the ALJ's determination in that

---

[11] *See, e.g.*, 20 C.F.R. § 404.1529(c)(3)(iv) (In assessing claimant's symptoms, the Agency considers, among other things, the "type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms").

respect.  Nothing in the medical record provides any indication that Hilton ever reported having side effects.

To the contrary, in May 2018, Hilton checked the "no" box when asked if the Vicodin and Valium "have any side effects."  (R. 210-11.)  Even Dr. Kramberg, in his functional assessment, did not mention any side effects.  (R. 483-489.)  And while Dr. Yevsikova noted that Hilton's current medications include Valium and Vicodin, she states that neither the dose or frequency is known and does not make any reference to side effects.  (R. 372.). Given the absence of any supporting medical evidence that Hilton experienced side effects, the ALJ's failure to discuss the subject was not error.  *See Martes v. Commissioner of Social Security,* 344 F. Supp. 3d 750, 768 (S.D.N.Y. 2018) ("Given the lack of any medical records corroborating [claimant]'s claimed side effects, we find no error in the ALJ's decision not to incorporate the side effects into a discussion of [claimant]'s RFC").

All that said, on remand, the ALJ would do well to make explicit his evaluation of any medicinal side effects.

## CONCLUSION

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), Hilton's motion is GRANTED, the Commissioner's motion is DENIED, and this case shall be remanded for further proceedings consistent with this opinion.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: May 9, 2022.
New York, New York

Copies transmitted on this date to all counsel of record.